## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRUCE J. HARRIER,

          *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

CASE NO. 2:16-cv-11456

DISTRICT JUDGE STEPHEN J. MURPHY, III

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 17)

## I.     RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Harrier is not disabled. Accordingly, **IT IS RECOMMENDED** that Harrier's Motion for Summary Judgment, (Doc. 14), be **DENIED**, the Commissioner's Motion, (Doc. 17), be **GRANTED**, and this case be **AFFIRMED**.

## II.     REPORT

### A.     Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Bruce Harrier's ("Harrier") claim for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C.

§ 401 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 17).

On April 15, 2013, Harrier filed an application for DIB, alleging a disability onset date of November 1, 2011. (Tr. 130-31). The Commissioner denied his claim. (Tr. 72-86). Harrier then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on October 29, 2014 before ALJ Patricia S. McKay. (Tr. 29-71). At the hearing, Harrier testified alongside Vocational Expert ("VE") Pauline Pegram. (*Id.*). The ALJ's written decision, issued December 22, 2014, found Harrier not disabled. (Tr. 10-28). On February 24, 2016, the Appeals Council denied review, (Tr. 1-5), and Harrier filed for judicial review of that final decision on February 22, 2016. (Doc. 1).

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See*

*Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994). If the Commissioner's decision is supported by substantial evidence, "it must be

affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations

omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'"

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than
> [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The

Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial
> gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment
> or combination of impairments that "significantly limits . . .
> physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three:   If the claimant is not performing substantial
> gainful activity, has a severe impairment that is expected to

last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically

determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.     ALJ Findings

Following the five-step sequential analysis, the ALJ found Harrier not disabled under the Act. (Tr. 13-24). At Step One, the ALJ found that Harrier last met the insured status requirements of the Social Security Act on December 31, 2016, and had not engaged in substantial gainful activity in the interval between his alleged onset date of November 1, 2011 and his date last insured. (Tr. 15). At Step Two, the ALJ concluded that the following impairments qualified as severe: degenerative joint disease of the knees bilaterally and the left foot, levoscoliosis of the lumbar spine, generalized anxiety disorder, and bipolar disorder. (Tr. 15-16). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 16-17). Thereafter, the ALJ found that Harrier had the residual functional capacity ("RFC") to:

> lift and carry up to 50 pounds occasionally, 25 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday with normal breaks. The claimant must avoid work requiring continuous grasping with the upper extremities. He can frequently climb stairs, crouch, crawl, kneel, stoop, or bend, but he must avoid workplace hazards such as moving machinery, unprotected heights, and climbing of ladders. The claimant is limited to low stress work / self-paced work, defined as work that is free of production-rate pace. He can have occasional contact with supervisors, coworkers, and the general public, but must never perform team or tandem duties with coworkers or be closely supervised . . . .

(Tr. 17-18). At Step Four, the ALJ found Harrier capable of performing past relevant work as a cleaner. (Tr. 24). Because this concluded her analysis, she declined to proceed to Step Five.

### E.     Administrative Record

#### 1.     Medical Evidence

The Court has reviewed Harrier's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.     Application Reports and Administrative Hearing

##### i.     Function Report

On June 3, 2013, Harrier filled out a Function Report on which appears in the administrative record. (Tr. 157-64). Describing his conditions, he indicated trouble "keeping on task" and "concentrating on work." (Tr. 157). "Changes in my meds interrupt my work continuity. I have periodic exacerbation from Bipolar Disorder" and "[d]uring acute episodes I have impaired social and/or occupational functions. Lack of focus/hyperactivity or withdrawal, [i]rritability to complete assigned tasks. Migraines have kept me from going to work. Lifting is too difficult. Cannot swing mop without pain. Depression makes it difficult to get up in [the] morning to go to work. My tremors could pose a safety issue. Carpal tunnel makes it difficult to write." (Tr. 157, 164). On a typical day, he would get dressed, help in the kitchen, nap, help in the kitchen, read or watch television for three hours, and visit with other veterans at the VA. (Tr. 158). As a result of his conditions, he slept more. (*Id.*). He also failed to bathe, care for his hair,

shave, and brush his teeth as frequently as he ought. (*Id.*). He needed reminders to take care of medication and other personal needs such as grooming. (Tr. 159).

He did not cook because he lived "in transitional housing." (*Id.*). However, he did his own laundry once a week for several hours. (*Id.*). "Every few days I sit outside. Once a week I get a ride to church." (Tr. 160). He remained able to drive a car. (*Id.*). About once a month he would go shopping for his parents for twenty minutes. (*Id.*). He needed an "accountability partner to handle my finances." (*Id.*). "I tend to waste my money now and am prone to impulsive spending." (Tr. 161).

As hobbies, he enjoyed reading and watching television. (*Id.*). He read about a book a week and watched two to three hours of television each day. (*Id.*). Since the onset of his conditions he read less. (*Id.*). He spent time talking with others daily, went to church every Sunday, and went to the movies "every couple months" or so. (*Id.*). As he acknowledged, though, he had "a difficult time developing friendships." (Tr. 162).

Prompted to indicate what abilities gave him trouble, he noted: lifting, bending, standing, walking, kneeling, talking, stair climbing, completing tasks, concentration, and using hands. (*Id.*). Expanding on this list, he noted he could not lift "more than 20 pounds. Bending causes back pain. Standing more than [30 minutes] my knees bother me. Not able to get up from kneeling. Knees painful [and] lock. When under stress I stutter. Stair climbing causes pain and stiffness. Hands shake" and "tremors" cause "pain." (*Id.*). Further, his "[l]ack of concentration affects ability to do detailed work. Without good concentration, I cannot complete tasks. My stamina is diminished which affects completion of tasks." (Tr. 164). He could walk half a mile before resting for ten minutes,

and pay attention for half an hour before his "mind wanders" or "varies." (Tr. 162). He had trouble filling out forms and applications, as well as following spoken instructions. (*Id.*). He did not conduct himself well around authority figures, and departed a job because he slung "[f]alse accusations" at others. (Tr. 163).

### ii. Harrier's Testimony at the Administrative Hearing

At the time of the hearing, Harrier was living by himself. (Tr. 34-35). He remained able to drive, and did so "once or twice a week." (Tr. 40). In order to do laundry, he noted that he had to take it down to the "laundry room" down on the first floor, but he remained able to do so. (Tr. 36). He served in the Air Force for just over thirteen years, beginning in 1982 until he was honorably discharged. (Tr. 37). His work thereafter encompassed mostly janitorial tasks and duties. (*Id.*). Harrier presently supported himself with "50 percent service connected" VA benefits. (Tr. 39).

The ALJ then began to ask Harrier about his mental conditions. He indicated that treatment for his bipolar condition was medication, (Tr. 41), but that his antidepressant medication caused tremors in his hands and arms. (Tr. 40). He also attended a psychological rehabilitation retraining center, which provided "a series of classes to[] take for different things depending on what your mental illness might be," (Tr. 41), as well as a "night class for addiction," (Tr. 49). To deal with his carpal tunnel, he simply tried "not to repeat various motions too many times." (Tr. 43). But ultimately, he was disabled "mostly[] from my bipolar disorder." (Tr. 45). "When I'm on one of the mania cycles, I tend to be short-tempered, ill-mannered, and generally, on occasion, misbehave, and I can't stay on – I can't stay on any one task or thought for . . . an appreciable amount

of time." (*Id.*). As he described it, his depression occurred "four to five times a month" while mania plagued him "three to four times a month." (*Id.*). On manic days, he had trouble sleeping. (Tr. 48).

In an average day, Harrier sat "around a lot reading or watching TV" and "listening to music." (Tr. 44). He enjoyed reading the news online. (Tr. 43). He estimated that he could stand for "[a]bout 20 to 30 minutes" due to the "arthritis in my knees and my left ankle and foot," (Tr. 49), and that he could lift "about 10 to 15 pounds" due to "the shakiness and tremors in my right arm," (Tr. 50). When he picked things up, he could not "hold steady. It shakes and wobbles all over the place. I have to put it down before I drop it." (*Id.*).

Harrier was evicted from his last apartment. (Tr. 50). At that time, he had a cat and "[t]here was feces all over the place in the bathroom. There was food dishes and containers left sitting all over the place, and I hadn't – I hadn't cleaned the apartment for a long time." (*Id.*). At the time of the hearing, however, he indicated that his "hygiene now is fairly good," though it suffered on his "depressed days, . . ." (Tr. 51). "I can go for three or four days without bathing." (*Id.*). On Sundays, he went to church with his family, then went "out to eat afterwards." (Tr. 52). He left the house "[t]wo to three times a week to go for walks," but on his "depressed days," "I'm usually laying down." (*Id.*). He had trouble sleeping and concentrating, especially on his depressed days. (Tr. 53). His memory was "not as good as it could be" and varied "depending on my mood." (Tr. 54).

### iii.     The VE's Testimony at the Administrative Hearing

The VE began by classifying Harrier's past work as "cleaner, commercial, or institutional" characterized as "heavy by the DOT." (Tr. 55). As a precaution, the VE also characterized his prior work as a "tire repairer" for the amount of time "he did work as a tire technician," a semi-skilled position requiring medium exertion. (Tr. 56).

The ALJ proceeded to ask her first hypothetical, posing a person limited to "a low-stress work environment. That would be work that is self-paced, not at production rate, requiring he have only occasional contact with his coworkers, or the public, or supervisors. He's not able to engage in team or tandem duties, and he shouldn't be closely supervised in that position. For grasping, he can use that – his upper extremities for grasping, but not continuously, so less than that would be frequent. And as far as postural activities, could – he could frequently climb stairs, and crouch, and [crawl], and kneel, and stoop, and bend, but he needs to avoid work around hazards, and no climbing of ladders. With those limitations, could the hypothetical person perform . . . either of these past jobs of Mr. Harrier?" (Tr. 57-58). The VE indicated that Harrier could perform his past work as a "cleaner, hospital"—with 1,300 statewide job availabilities, 500 regional job availabilities, and 64,000 national job availabilities—as well as "hand packager"—with 1,200 statewide job availabilities, 500 regional job availabilities, and 50,100 national job availabilities—and "warehouse worker"—with 1,500 statewide job availabilities, 600 regional job availabilities, and 34,600 national job availabilities. (Tr. 59). Because the hypothetical required low-stress work, however, such a person could not perform Harrier's past work as a tire repairer. (Tr. 60).

A limitation to light work would preclude all past work. (Tr. 61). Nonetheless, the VE identified other jobs such a hypothetical person could perform at the light exertional level: "cleaner, housekeeper"—with 2,100 statewide job availabilities, 800 regional job availabilities, and 99,100 national job availabilities—"laundry worker"—with 3,900 statewide job availabilities, 1,500 regional job availabilities, and 184,400 national job availabilities—and "hand packager[]"—with 20,000 statewide job availabilities, 8,000 regional job availabilities, and 300,000 national job availabilities. (Tr. 61-62). Sedentary work also existed for such a person: "persons who do hand assembly, working at benches or tables, and carrying out this simple task of hand assembly"—with 5,000 statewide job availabilities and 80,000 national job availabilities—"inspectors and sorters"—with 4,000 statewide job availabilities and 80,000 national job availabilities—and "some boxers or packagers"—with 5,000 statewide job availabilities and 90,000 national job availabilities. (Tr. 62).

To this, the ALJ added a wrinkle to the hypothetical, asking whether limiting use of the upper extremities for grasping to an occasional basis might affect the VE's numbers. (Tr. 63). Such a limitation, the VE indicated, would preclude all the jobs listed. (*Id.*). If instead the person required a sit/stand option, certain jobs would exist: "hand assemblers"—with 4,000 statewide job availabilities and 70,000 national job availabilities—"inspectors and sorters"—with 2,500 statewide job availabilities and 50,000 national job availabilities—boxer and packager—with 3,500 statewide job availabilities and 60,000 national job availabilities. (Tr. 65-66). The light jobs of "cleaner, housekeeper, [and] laundry worker" listed previously, however, would be

precluded. (Tr. 66). The bundled group "offhand packagers" would exist but in lesser numbers—reduced to 8,000 statewide job availabilities and 130,000 national job availabilities. (*Id.*). A sit/stand option precluded all the medium work identified previously. (Tr. 67).

In the final hypothetical, the ALJ asked of a person "likely to be off task more than 20 percent of an average workday." (Tr. 67). The VE indicated that such a limitation was work-preclusive. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527.

Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

> (v) Treatment, other than medication, . . . received for relief of . . . pain;
> (vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Harrier presents two arguments in his motion for summary judgment: (1) the ALJ's RFC lacks the support of substantial evidence, therefore invalidating her Step Four conclusion, and (2) the ALJ failed to adequately consider his non-service connected pension benefits under 06-03p. I address each argument in turn.

### 1.    The RFC and Step Four Conclusion

Harrier suggests that the ALJ's RFC assessment "falls short of including the entirety of [his] limitations." (Doc. 14 at ID 484). In particular, he supposes that a limitation merely to 'low-stress' work fails to adequately account for his difficulties performing work on a sustained basis, and proclaims that "substantial evidence in the record" corroborates his argument. (*Id.*). To this, the Commissioner argues that Harrier "points to no evidence that he is unable to deal with changes in work settings or perform the basic demands of unskilled work on a sustained basis." (Doc. 17 at ID 517).

As an initial matter, Harrier couches his RFC challenge as a Step Five challenge, opening his argument by commenting on the ALJ's "erroneous Step Four and Five determinations . . . unsupported by the substantial weight of the evidence." (Doc. 14 at ID 483). He correctly notes that the Commissioner carries the burden at Step Five. (*Id.*). However, the ALJ in this case decided that Harrier could perform his past work, *never proceeding* to Step Five. (Tr. 24). Accordingly, I address Harrier's argument for what it is—a challenge to the ALJ's RFC, which Harrier carried the burden to prove. *E.g.*, *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("[W]e reject plaintiff's contention that once the burden of proof shifts to the Commissioner at step five, the Commissioner is then required to prove a claimant's Residual Functional Capacity."); *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994) ("The burden of proof is on the claimant throughout the first four steps of this process to prove that he is disabled.").

The evidence Harrier cites, however, is sparse and makes but a tenuous case for a more restrictive RFC. It encompasses: (a) check-box notes indicating social impairments and their negative impact on his employment, (Tr. 231, 234); (b) two pages allegedly showing signs of decompensation, (Tr. 282-83); (c) several pages of records from Harrier's mental health counseling group, which he avers (without elaboration) show "significant impairments" in his functional capacity, (Tr. 284-87); (d) a blanket reference to the VA's favorable benefits determination, (Tr. 416-17); and (e) Harrier's testimony as to his bad days, lack of motivation, and emotional instability, (Tr. 45, 51). (Doc. 14 at ID 485). After citing this evidence, he says (in conclusory fashion) that "[i]t does not follow that limitations to low stress work, occasional contact with others, and no close supervision accurately reflects [his] RFC or these accommodations satisfy the legal requirements the ALJ must follow when formulating an RFC." (*Id.*). Nowhere does Harrier offer additional limitations the ALJ ought to have included, or make an *argument* as to why the RFC's limitations do not, in fact, accommodate the conditions implied by the cited evidence. Without developing his claim to a more restrictive RFC, Harrier's attack cannot prevail. *Accord, e.g.*, *Perdue v. Colvin*, No. CV 15-14006, 2017 WL 362668, at *3 (E.D. Mich. Jan. 9, 2017), *report and recommendation adopted sub nom. Perdue v. Comm'r of Soc. Sec.*, No. 15-14006, 2017 WL 976790 (E.D. Mich. Mar. 14, 2017); *Cason v. Colvin*, No. CV 15-12661, 2016 WL 6653019, at *5 (E.D. Mich. Aug. 9, 2016), *report and recommendation adopted in part sub nom. Cason v. Comm'r of Soc. Sec.*, No. 15-12661, 2016 WL 4546872 (E.D. Mich. Sept. 1, 2016) (same); *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)) (internal quotation marks omitted)).

Harrier also declined to challenge the ALJ's credibility assessment and weight assignments, effectively waiving any argument that error marred these facets of the ALJ's opinion. *Accord Randolph v. Comm'r of Soc. Sec.*, No. CV 15-11945, 2016 WL 7206711, at *7 (E.D. Mich. Aug. 16, 2016), *report and recommendation adopted,* No. 15-11945, 2016 WL 7178742 (E.D. Mich. Dec. 9, 2016) ("Randolph does not argue that the ALJ erred in his analysis of this opinion and, thus, has waived any such argument."); *see also Bracey v. Comm'r of Soc. Sec.*, No. 10-12659, 2011 WL 3359678, at *6 (E.D. Mich. July 13, 2011), *report and recommendation adopted,* No. 10-CV-12659-DT, 2011 WL 3359924 (E.D. Mich. Aug. 4, 2011) ("Any issue not raised directly by plaintiff is deemed waived."). And in any case, the ALJ provided a thorough review of the record evidence, adequately explained her findings, and referenced substantial evidence in doing so. *See generally* (Tr. 18-23) (elaborating upon Harrier's lack of credibility, the dearth of objective support for his subjective claims, and the medical evidence in support of the RFC, citing to supporting evidence at each step).

For these reasons, Harrier's argument as to the RFC should not prevail, and this Court should reject it.

## 2.  Compliance with SSR 06-03p

Harrier notes that the ALJ cannot ignore decisions from another governmental or nongovernmental agency which bear on her disability determination, and argues that the ALJ's failure here to assign weight to the VA favorable disability determination taints her ultimate rationale behind denying benefits. (Doc. 14 at ID 482). He analogizes the ALJ's alleged lack of consideration to the circumstances in *King v. Comm'r of Soc. Sec.*, 779 F. Supp.2d 721, 726 (E.D. Mich. 2011), in which the ALJ claimed to have considered the VA's determination "but did not explain whether she accorded any weight." (Doc. 14 at ID 481). "It is not harmless error when the ALJ does not provide a reasoning or explanation for her analysis." (Doc. 14 at ID 482). The Commissioner's riposte distinguishes the VA benefits process from the one at issue here, and suggests that the ALJ in fact considered the VA determination adequately, unlike the ALJ in *King*. (Doc. 17 at ID 509).

Per SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006), "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." As the *King* court recognized, the "Sixth Circuit has observed that disability decisions of other governmental agencies should be taken into account" but "has not addressed the question as to the weight the Commissioner must give to the disability determinations of the VA." 779 F. Supp. 2d at 725. When it remanded the case, however, it did not fault the ALJ's failure to assign weight, *per se*, but rather the "absence of any meaningful discussion of the evidence." *Id.* at 726. And in *Ritchie v. Comm'r of Soc. Sec.*—where the Sixth Circuit had more recent occasion to

address this issue—it reaffirmed that a "disability rating by the Veterans Administration is *only one factor* to be considered in making a social security disability finding." 540 F. App'x 508, 511 (6th Cir. 2013) (emphasis added).

The ALJ's opinion at issue, while acknowledging the disability rating assigned to Harrier by the VA, exhaustively considered Harrier's medical records and allegations, including records on which the VA based its own 2012 decision. *E.g.*, (Tr. 21) ("While the claimant was earlier assessed a GAF of 50 by his psychologist Dr. Gaulier in 2012, this reassessment concludes his GAF had improved to 60, which is given great weight."); *see also* (Tr. 237) (Dr. Gaulier estimating Harrier is "likely to be able to work"); (Tr. 283) (though record says "[s]howing signs of decompensation," the mental evaluation appears otherwise normal); (Tr. 83) (Dr. Csokasy finding Harrier "able to perform simple/routine tasks on a sustained basis"). Indeed, because the ALJ offered convincing reasons for discounting much of the evidence on which the VA determination relied, she sufficiently evinced the weight and consideration given the VA determination. *Cf. Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (upholding an ALJ's implicit weight assignment because it fulfilled the goals of the regulations).

For this reason, Harrier's objection to the ALJ's weighing of the VA disability determination cannot shield his claim from an adverse judgment. The Court should find his argument unpersuasive.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Harrier's Motion for Summary Judgment, (Doc. 14), be **DENIED**, the Commissioner's Motion, (Doc. 17), be **GRANTED**, and this case be **AFFIRMED**.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.

R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 23, 2017                                    S/ PATRICIA T. MORRIS
                                                      Patricia T. Morris
                                                      United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 23, 2017                                    By s/Kristen Castaneda
                                                      Case Manager